UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
JACOB SCHWARTZ,                                                   :
                                                                  :
                                  Plaintiff,                       :
                                                                  :                    19 Civ. 5204 (JPC)
                   -v-                                             :
                                                                  :                   OPINION AND ORDER
                                                                  :
THE CITY OF NEW YORK,                                             :
                                                                  :
                                  Defendant.                       :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Jacob Schwartz sued his former employer, the City of New York (the "City"), for non-payment of wages.  Dkt. 24 ("Third Am. Compl.").  The Court previously dismissed three of the four claims in Schwartz's Third Amended Complaint.  Dkt. 62.  Now before the Court is the City's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the only remaining claim in this action—that the City violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), by failing to pay Schwartz overtime for work performed in excess of forty hours in a given week.  For the reasons that follow, the City's motion is granted.

## I. Background[1]

### A. Factual Allegations[2]

Schwartz worked at the New York City Department of Design and Construction ("DDC") from May 5, 2015 to May 28, 2017. Def. 56.1 Stmt. ¶¶ 1-2. Schwartz is a college graduate with a bachelor's degree in electrical engineering. Dkt. 75 ("Schwartz Dep. Tr.") at 9:17-23.

While working for the City, Schwartz worked on the Build It Back Program ("BIB Program") unit within the DDC. Def. 56.1 Stmt. ¶¶ 19-20; Schwartz Dep. Tr. at 33:25-34:3. The Mayor's Office of Housing Recovery Operations launched the BIB Program to help families after Hurricane Sandy by coordinating home repairs, rebuilding, and improvements. Def. 56.1 Stmt. ¶ 17. The City did so by providing reimbursement checks or construction services, or by acquiring families' homes. *Id.* ¶ 18.

At the time Schwartz was hired, the BIB Program unit was just being formed, and Schwartz was one of its first employees. *Id.* ¶ 19. Schwartz initially worked as a Project Manager Intern, for

---

[1] The following facts are drawn from the City's statement of material facts pursuant to Local Civil Rule 56.1, Dkt. 76 ("Def. 56.1 Stmt."), Schwartz's response to the City's statement of material facts, Dkt. 92 ("Pl. Counter 56.1 Stmt."), and the declarations submitted in support of and in opposition to the City's motion for summary judgment, as well as the exhibits attached thereto. Unless otherwise noted, the Court cites to only one party's Rule 56.1 Statement or Counter 56.1 Statement where the parties do not dispute the fact, the adverse party has offered no admissible evidence to refute that fact, or the adverse party simply seeks to add its own "spin" on the fact or otherwise dispute the inferences from the stated fact.

[2] Except where cited to below, Schwartz's Counter 56.1 Statement fails to create an issue of fact, as it contradicts Schwartz's own testimony without any reasonable explanation, *see, e.g.*, Pl. Counter 56.1 Stmt. ¶¶ 22-23, 28, 33-34, 36, 39-41, 43, 48, 52, 68, 72, or makes conclusory denials without any supporting evidence, *id.* ¶¶ 35, 59, 60, 72, 77. *See* Local Civ. R. 56.1; *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013) (instructing that a court "may determine that a [party] has manufactured a sham issue of fact" if there is an "unexplained" discrepancy between the new fact and the party's prior testimony); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001) ("[D]istrict courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (internal quotation marks and alterations omitted)).

which he earned a salary of $52,000. *Id.* ¶¶ 14-15. However, Schwartz only performed the role of a Project Manager Intern during his first month of employment. *Id.* ¶ 26; Schwartz Dep. Tr. at 49:5-15. After that, while he maintained the same job title, Schwartz performed the work of an Acting Document Control and Data Analyst and was a "leading data analyst for the [BIB] project." Def. 56.1 Stmt. ¶¶ 27-28; Schwartz Dep. Tr. at 49:5-15. In May 2016, Schwartz was promoted to the civil service title Computer Programming Analyst, Level II, with a salary of $66,360. Def. 56.1 Stmt. ¶¶ 30-31. Schwartz testified that to get that promotion, he was required to have taken a course in computer technology. Schwartz Dep. Tr. at 51:3-10.

According to the job description, a Computer Programmer Analyst II was to act "[u]nder general direction and with wide latitude for the exercise of independent initiative and judgment." Dkt. 75, Exh. G at 2. A Computer Programmer Analyst II was tasked with "[c]od[ing] program instructions"; "[a]ssist[ing] in surveys and feasibility studies"; "[d]ocument[ing] computer systems and programs"; "[a]ssist[ing] in writing procedure manuals"; and "[m]eet[ing] with users of computer services" to "explain[] the procedures and standards required"; as well as "perform[ing] more complex and responsible work in the development of computer programs." *Id.* at 1-2. According to the "salary justification," a Computer Programmer Analyst II, with "latitude for independent judgment," was to "be responsible for review and analysis of various data and document submissions in Case Management System [('CMS')]," New York City's Housing Recovery Office's "master system of record"; "act[] as a primary client liaison"; "assist[] with the development of overall functions and document management in CMS"; and "create[e] various reports from CMS and reconcile any data anomalies in CMS." Dkt. 75, Exh. F; *id.*, Exh. C ("Flaherty Dep. Tr.") at 15:3-7. The salary justification also stated that Schwartz's "[r]esponsibilities can include developing various tracking mechanism[s] and reports for [the] BIB

program."  Dkt. 75, Exh. F.  Schwartz testified that "[b]roadly speaking," the job description accurately reflected his job duties, Schwartz Dep. Tr. at 52:25-53:6, and that the salary justification accurately reflected "some" of his job duties, *id.* at 53:7-21.

Schwartz also testified during his deposition that his job responsibilities were the same before and after he was promoted.  Def. 56.1 Stmt. ¶ 32; Schwartz Dep. Tr. at 49:16-19.  Schwartz testified that when he was first hired, he was assigned with "reviewing maps to find the locations of fire hydrants so that . . . the fire department could be notified about upcoming construction" and "contacting subcontractors to verify their contract information."  Schwartz Dep. Tr. at 14:23-15:3.  But, "[a]fter a couple of days," Schwartz was assigned to Mohammed Haque's team, where they "started building reporting metrics for progress on the project," meaning he was "keeping track of" things like "how much money [they] were projecting to spend on various forms of construction, how long [they] were projecting the project to take based off of contracts," and "what types of construction each home was going to go through."  *Id.* at 15:4-14.

Schwartz stated on his resume that as a Project Manager Intern, he "[m]anaged subcontractor [and] work[-]order vetting, mapping of work areas, script [and] presentation development[,] [and] internal systems testing."  Dkt. 75, Exh. E.  As Schwartz explained, the Housing Recovery Office would assign houses for the DDC to work on via a work order.  Schwartz Dep. Tr. at 35:21-23.  The work orders would include, among other things, a list of addresses where work was to be done; the names of the individuals in those homes; the type of work that needed to be done, *i.e.*, elevation, reconstruction, or rehabilitation; and the approximate project cost.  *Id.* at 35:23-36:9.  Schwartz testified that he helped perform "most" of the work-order vetting, which took approximately twenty percent of his time.  *Id.* at 37:2-23.

Schwartz testified that he did not actually manage the subcontractors, but instead worked with approximately one hundred subcontractors to "[h]elp[] clarify project parameters" and "check[] to make sure that they had filed the proper paperwork to be considered for various pieces of the job." *Id.* at 34:22-35:18. To vet the work orders, Schwartz and others had a "checklist of things that [they] had to go through," including confirming the projects "fit the required parameters" and had the proper paperwork in CMS. *Id.* at 36:10-14, 24-25; Pl. Counter 56.1 Stmt. ¶ 37. They also had to vet them for location "so that [they] knew which construction management firms to assign them to." Schwartz Dep. Tr. at 36:21-23. Schwartz would also resolve the "[c]onstant" problems that arose during vetting. *Id.* at 37:24-38:16.

Schwartz testified that he would "adjust the budgeting" based on the projects his team was assigned. *Id.* at 56:3-6. Schwartz and his team were given a description of the average cost of each type of project, and Schwartz had to "project how much money it would cost to do all of the projects based off of those individual estimations." *Id.* 55:15-21. This was an ongoing, long-term task: "[A]s the project moved forward, the construction management firms revised their estimates of what different pathways were going to cost. . . . [S]o those adjustments were also added into the budget estimates." *Id.* at 56:7-11.

Schwartz also created a system to better track the project data. Schwartz testified that the team initially calculated various metrics and reports on the status of the project by hand. *Id.* at 42:15-24. They then used "very crude Excel spreadsheets," *id.* at 40:5-7, until Schwartz "built from the ground up" a "sophisticated data tracking system," *id.* at 40:7-12.[3] Specifically, Schwartz

---

[3] As noted above, Schwartz repeatedly denies his own testimony, including this statement. *See* Opposition at 14, 16-17. Schwartz cannot create a material issue of fact by simply denying his own statements without any real explanation. *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d at 194 (instructing that a court "may determine that a [party] has manufactured a sham issue of

"designed several Excel workbooks that . . . automatically calculated various metrics." *Id.* at 41:2-10.  Schwartz testified that he was not assigned to make the new tracking system. *Id.* at 42:8-43:3.  By the time Schwartz left, this system executed five or six different reports on a daily basis. *Id.* at 43:7-14.  In addition, Schwartz would, in connection with this data tracking system, "go to the various boroughs to train team members in how to enter the data." *Id.* at 46:17-47:4.

In his role—which he unofficially termed "the lead project analyst"—Schwartz worked directly with high-level City administrators. *Id.* at 47:25-48:1.[4]  He testified that he "frequently was assigned to write up short statements or PowerPoint presentations for the [A]ssistant [C]ommissioner [of DDC] . . . to present to the [C]ommissioner or to the [A]ssociate [C]ommissioner or to any other departmental heads about progress on the project," including "progress numbers" and "descriptions of any . . . ongoing successes or problems." *Id.* at 39:19-40:1.  Schwartz was "frequently called upon to sit and meet with the [A]ssociate [C]ommissioner, the [C]ommissioner himself, [and] the head of the Housing Recovery Office," and "attended meetings at City Hall several times with the [D]eputy [M]ayor." *Id.* at 48:4-7.  He attested that he "directly advise[d]" the Assistant Commissioner "[a]lmost daily." *Id.* at 56:15-17.

While he was employed, Schwartz was a member of a union, District Council 37,  meaning the terms of his employment with DDC were covered by the collective bargaining agreement

---

fact" if there is an "unexplained" discrepancy between the new fact and the party's prior testimony).

[4] Schwartz states that he "was 'a' lead representative, not 'the' lead representative." Opposition at 15; *see also* Dkt. 91 ("Schwartz Declaration") ¶¶ 4 ("On page 5 of counsel's brief it states that I was 'the' lead representative of the BIB Program . . . . [A]ll I stated was that I was 'a' lead representative, who attended meetings at City Hall 'several times.'" (citing Schwartz Dep. Tr. at 48:4-8)), 8 ("[C]ounsel again calls me 'the' lead data analyst and DDC's 'lead representative,' but nowhere in the deposition, on the pages cited, . . . did I say I was anything other than 'a' lead representative in terms of data."). But the testimony reflects that Schwartz did in fact testify he was "the lead project analyst." Schwartz Dep. Tr. at 47:25-48:1.

("CBA") entered into between the union and the City's Office of Labor Relations.  Def. 56.1 Stmt. ¶ 61.  Under the CBA, Schwartz was entitled to earn either cash or compensatory time when he worked over thirty-five hours in one week.  *Id.* ¶ 62.  If Schwartz worked a holiday, he was also entitled to earn overtime pay at a one-and-a-half rate in cash or compensatory time.  *Id.* ¶ 63.  An employee can use compensatory time as paid time off work.  *Id.* ¶ 64.

At the time of his termination, Schwartz had banked 457 hours and ten minutes of compensatory time for time worked over thirty-five hours per week, and twenty-six hours and twenty-eight minutes of compensatory time for time worked on holidays.  *Id.* ¶ 78.  Schwartz testified that it was his practice to request overtime in the form of compensatory time because he "felt that the time was more valuable to [him] as potential leave time than it was as additional straight pay on [his] paycheck."  Schwartz Dep. Tr. at 26:24-27:8.  On some weeks, Schwartz worked more than forty hours per week.  *See* Schwartz Declaration ¶ 12, Exh. 1.[5]  Schwartz states

---

[5] The Court rejects the City's argument that Schwartz's declaration must be disregarded because it does not substantially comply with 28 U.S.C. § 1746, which governs the admissibility of declarations made under penalty of perjury.  *See* Dkt. 97 ("Reply") at 1-3; 28 U.S.C. § 1746 (requiring unsworn declarations be "in substantially the following form":  "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature).").  While Schwartz did not specifically state that the facts therein were "true and correct," he did "declare[] under penalty of perjury" at the start of his declaration.  Schwartz Declaration at 1; *see Redman v. N.Y. State Dep't of Corr. Servs.*, No. 10 Civ. 5368 (VB), 2015 WL 897434, at *1 n.2 (S.D.N.Y. Feb. 23, 2015) (finding that a declaration made "under penalty of perjury" but that did not state the facts were "true and correct" substantially complied with section 1746).

However, the Court does not credit Schwartz's declaration where it is in conflict with his previous deposition testimony, as Schwartz has provided no explanation for these discrepancies.  *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d at 194.  Nor does the Court credit the legal arguments—which are nearly verbatim to those in his opposition brief—in Schwartz's declaration.  *See, e.g., Pacenza v. IBM Corp.*, No. 04 Civ. 5831 (SCR), 2007 WL 9817926, at *2 (S.D.N.Y. July 26, 2007) (striking paragraphs from a declaration constituting "argument and analysis" as "wholly inappropriate for a declaration"), *aff'd*, 363 F. App'x 128 (2d Cir. 2010).

that he "got paid time and a half for some of those weeks," but does not specify which weeks. *Id.* ¶ 12.

Janice Stroughter, who was Associate Commissioner of Human Resources at DDC at the time of Schwartz's employment, testified that the City typically paid out accrued compensatory time at the time of an employee's termination. Def. 56.1 Stmt. ¶ 76; *see* Dkt. 75, Exh. H ("Stroughter Dep. Tr.") at 28:6-12. Similarly, Schwartz testified that he was told that his compensatory time "would be paid out" after his employment ended. Schwartz Dep. Tr. at 28:23-25.

Schwartz was arrested on May 27, 2017, and DDC terminated him the following day because of this arrest. Def. 56.1 Stmt. ¶¶ 54-56. Schwartz eventually pleaded guilty to promotion of a sexual performance of a person under seventeen years of age, and was also charged with possession of a sexual performance of a minor, to which he did not plead guilty. *Id.* ¶ 57. Following his arrest, the City declined to pay Schwartz for his accrued compensatory time. *Id.* ¶ 77. The City contends this was because of what it considered the "egregious nature of his criminal charges" and because some individuals believed that Schwartz had viewed pornography depicting minor children during work hours and on a work computer. *Id.*; Pl. Counter 56.1 ¶ 77; Stroughter Dep. Tr. at 31:5-33:19. It is not clear if the City in fact found child pornography on Schwartz's computer. Pl. Counter 56.1 ¶ 77.

## B.  Procedural History

Schwartz filed his Complaint on June 3, 2019. Dkt. 1. This case was originally assigned to the Honorable Analisa Torres. Schwartz filed a First Amended Complaint on June 4, 2019, Dkt. 7; a Second Amended Complaint on July 15, 2019, Dkt. 15; and a Third Amended Complaint on August 28, 2019.

The Third Amended Complaint alleged that by failing to pay Schwartz overtime pay for the time he worked in excess of forty hours a week, the City violated the FLSA and section 12-108 of the New York City Administrative Code.  Third Am. Compl. ¶¶ 16-21.  It also alleged that the City breached an oral contract when it failed to pay Schwartz for the compensatory time he had accrued for work in excess of thirty-five hours per week, as his supervisors had allegedly promised.  *Id.* ¶¶ 22-25.  Finally, the Third Amended Complaint brought an unjust enrichment claim for the value of Schwartz's compensatory time.  *Id.* ¶¶ 26-28.

On September 20, 2019, the City moved to dismiss the Third Amended Complaint.  Dkt. 25.[6]  Judge Torres referred this case to the Honorable Stewart D. Aaron for general pretrial purposes and for a Report and Recommendation on the motion to dismiss.  Dkt. 44.  On January 22, 2020, Judge Aaron issued a Report and Recommendation, which recommended that the City's motion be denied as to Schwartz's FLSA claim but granted as to Schwartz's claim under section 12-108 of the Administrative Code and as to his breach of contract and unjust enrichment claims. Dkt. 52.  On February 3, 2020, Schwartz filed objections to the Report and Recommendation. Dkts. 53, 54.  On February 11, 2020, the City opposed those objections.  Dkt. 55.  On June 3, 2020, Judge Torres overruled Schwartz's objections and adopted the Report and Recommendation.  Dkt. 62.

On September 4, 2020, the City filed a motion for summary judgment on Schwartz's single remaining FLSA claim.  Dkts. 74, 77 ("Motion").  In support of its motion for summary judgment, the City submitted various documents, including the transcripts from the depositions of Christine Flaherty, the Associate Commissioner of DDC while Schwartz was employed there, *see* Dkt. 75,

---

[6] The City did not move to dismiss on the basis that Schwartz was an exempt employee— an argument that forms the basis of its summary judgment motion—because the City recognized the fact-intensive nature of that inquiry.  *See* Dkt. 26 at 4-5.

Exh. C ("Flaherty Dep. Tr."); Schwartz, *see* Schwartz Dep. Tr.; and Janice Stroughter, *see* Stroughter Dep. Tr.  On December 8, 2020, Schwartz filed his opposition.  Dkts. 91, 93, 94 ("Opposition").   In support of his opposition, Schwartz submitted, among other things, the deposition transcript of Mohammed Haque, Schwartz's immediate supervisor, Dkt. 89, Exh. A ("Haque Dep. Tr."), and Michael Kenny, a project executive at DDC while Schwartz was employed at the City, *id.*, Exh. B ("Kenny Dep. Tr.").  On January 15, 2021, the City submitted its reply.  Dkt. 97.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'"  *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New*

*York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).  The non-movant must present more than a "scintilla of evidence."  *Anderson*, 477 U.S. at 252.  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

## III.   Discussion

The City moves for summary judgment on the remaining FLSA claim, arguing that (1) Schwartz was properly classified as exempt from the overtime provisions of the FLSA under both the so-called "administrative exemption," 29 U.S.C. § 213(a)(1), and the "computer employees exemption," *id.* § 213(a)(17), or (2) alternatively, even if Schwartz was not exempt, the record is devoid of evidence showing that the accrued compensatory time here is entitled to the protections of the FLSA.

## A. Applicable Law

"Congress enacted the Fair Labor Standards Act some eighty years ago in order to correct 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'"  *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018) (quoting 29 U.S.C. § 202(a)).  The FLSA thus imposes substantive wage, hour, and overtime standards, including requiring employers to pay their employees overtime compensation for time worked over forty hours in one week.  *Id.*; 29 U.S.C. § 207(a).

However, Congress exempted categories of employees from this requirement.  For purposes of this Opinion and Order, the "administrative exemption" is relevant.[7]  That exemption applies to

---

[7] As noted, the City also moves for summary judgment on the grounds that Schwartz was exempt pursuant to the "computer employees exemption," which, subject to certain exceptions, exempts a "computer systems analyst, computer programmer, software engineer, or other similarly

an employee who works in a "bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). The employer bears the burden of demonstrating an exemption applies. *Flood*, 904 F.3d at 227.

Until recently, the Second Circuit counseled that courts should narrowly construe FLSA exemptions in light of the statute's remedial purpose. *See id.* at 228 (citing *Reiseck v. Universal Commc'ns of Mia., Inc.*, 591 F.3d 101, 104 (2d Cir. 2010); and then citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). However, the Supreme Court recently rejected this approach, stating that "[t]he narrow-construction principle relies on the flawed premise that the FLSA pursues its remedial purpose at all costs." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks omitted). Instead, because exemptions are "as much a part of the FLSA's purpose as the overtime-pay requirement," courts must give the exemption "a fair reading." *Id.*; *see Flood*, 904 F.3d at 228. When determining whether an exemption applies, the question of what tasks an employee performed is a question of fact whereas the question of whether an employee's activities are exempt is a question of law. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).

The FLSA exempts from overtime pay requirements employees who work in "bona fide . . . administrative . . . capacit[ies]." 29 U.S.C. § 213(a)(1). This exemption applies to "any employee" (1) who is compensated on a salary or fee basis" at a certain rate, which at the time of Schwartz's employment was at least $455 per week;[8] (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the

---

skilled worker." 29 U.S.C. § 213(a)(17); 29 C.F.R. §§ 541.400-.402. Because the Court concludes that there is no genuine issue of material fact with respect to whether Schwartz fell under the "administrative exemption," it does not reach whether he also fell under the "computer employees exemption."

[8] As of January 1, 2020, the relevant threshold is $684 per week.

12

employer or the employer's customers"; and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

The federal regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* When assessing the primary duty of an employee, courts should consider "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* While the time spent on exempt work is a "useful guide," it is not determinative. *Id.* § 541.700(b).

## B. Analysis

Schwartz does not offer any arguments challenging his satisfaction of the first two prongs of the test. *See* Opposition at 11-16 (contesting only the third prong of the exemption). Nor could he. First, Schwartz's two roles both met the weekly salary threshold in place at the time. Schwartz was initially hired as a Project Manager Intern on May 4, 2015, with a starting salary of $52,000. Def. 56.1 Stmt. ¶ 15; Dkt. 75, Exh. A. He was then promoted to a Computer Programming Analyst II in May 2016, with a salary of $66,360.00. Def. 56.1 Stmt. ¶¶ 30-31.

Second, Schwartz's "primary duty" was "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200. The federal regulations define this as work "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.*

§ 541.201(a); *see Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531-32 (2d Cir. 2009).  It includes various "functional areas," such as budgeting; auditing; quality control; procurement; computer network, internet, and database administration; and "similar activities."   29 C.F.R. § 541.201(b).   The Second Circuit has distinguished "employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business," only the latter of which falls under the administrative exemption.  *Davis*, 587 F.3d at 535.

Schwartz testified that he was unofficially "the lead project analyst" on the BIB project. Schwartz Dep. Tr. at 47:25-48:1.  In that role, Schwartz performed a variety of tasks, including tracking project data, *id.* at 15:4-14, working with subcontractors to "[h]elp[] clarify project parameters" and "check[] to make sure that they had filed the proper paperwork to be considered for various pieces of the job," *id.* at 34:22-35:18, and vetting work orders, *id.* at 37:2-23.  Schwartz also frequently met with and advised the Associate Commissioner and other officials.  *Id.* at 48:4-7, 56:15-17.  The record does not reflect that Schwartz was involved in selling products or in the "production" of the BIB Program's output.  Thus Schwartz's work was plainly "related to assisting with the running or servicing of the business."  29 C.F.R. § 541.201(a).

Schwartz contests only the third prong of the "administrative exemption," asserting that there are issues of fact as to whether his "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance."  *Id.* § 541.200; Opposition at 11. The relevant federal regulations explain that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).

The federal regulations counsel that "[t]he phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises." *Id.* § 541.202(b).   Factors to consider include: (1) "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices"; (2) "whether the employee carries out major assignments in conducting the operations of the business"; (3) "whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business"; (4) "whether the employee has authority to commit the employer in matters that have significant financial impact"; (5) "whether the employee has authority to waive or deviate from established policies and procedures without prior approval"; (6) "whether the employee has authority to negotiate and bind the company on significant matters"; (7) "whether the employee provides consultation or expert advice to management"; (8) "whether the employee is involved in planning long- or short-term business objectives"; (9) "whether the employee investigates and resolves matters of significance on behalf of management"; and (10) "whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." *Id.*; *see Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 130 (2d Cir. 2020).

The employee must have "authority to make an independent choice, free from immediate direction or supervision," but "can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c).  However, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e).  It does not include "clerical . . . work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." *Id.*

15

The evidence in the record—primarily Schwartz's own testimony—reflects that Schwartz's primary duties went beyond simply tabulating data and instead involved exercising discretion and independent judgment.[9]  First, Schwartz had the authority to formulate and implement operating practices for DDC's BIB Program and did so without direct instruction.   Most prominently, Schwartz played an important role in developing data tracking and collection methods within the BIB Project.  Schwartz testified that the team initially calculated certain metrics by hand, Schwartz Dep. Tr. at 42:20-23, and then collected their data in "very crude Excel spreadsheets," *id.* at 40:5-7.  Schwartz attested that, on his own initiative, he "built from the ground up" a "sophisticated data tracking system" that permitted DDC to report on "hundreds of metrics in a very, very quick fashion."  *Id.* at 40:3-12, 41:1-10; *see generally id.* at 42:8-25, 43:1-3.  Schwartz "designed" Excel workbooks to "automatically calculate[] various metrics."  *Id.* at 41:2-10.  Schwartz testified that the development of this new system "was a constant ongoing thing" and that he and others adapted it to the needs of the team.  *See id.* at 44:6-14 ("It was like they need a new metric, okay, how are we going to generate that metric, come up with a solution, and develop reports to get that metric out . . . .").  By the time Schwartz left, this system produced five or six different reports on a daily basis.  *Id.* at 43:7-14.  This work was critically important to the project:  Christine Flaherty attested that the daily report "was used by all of us to see where we were across over a thousand homes and all three boroughs."  Flaherty Dep. Tr. at 14:4-7.

Schwartz does not appear to argue that the development of a sophisticated tracking system, on one's own initiative, does not reflect the exercise of independent discretion.  Instead, he attempts

---

[9] Schwartz testified that he performed the duties of a Project Manager Intern only for the first month of his employment.  Def. 56.1 Stmt. ¶ 26.  To the extent those duties differed from his primary duties explained in this Opinion and Order, it is immaterial to the resolution of this case, as the time records Schwartz provided reflect that he did not work more than forty hours during any of his first five weeks of employment.  *See* Schwartz Declaration, Exh. 1 at 1.

to downplay his role.  Schwartz contends that it "is extremely misleading" to describe this tracker as a "sophisticated tracking system" and that "[n]o witness used the words 'sophisticated data tracking system.'"  Opposition at 14.  But this is in direct conflict with the record:  Schwartz *himself* called it a "sophisticated data tracking system" during his deposition.  Schwartz Dep. Tr. at 40:3-12; *see* Motion at 13-14.  "Any 'minimization of the level of [Schwartz's] work' in his summary judgment submissions is thus 'directly contradicted by his own assessment of his accomplishments' in his testimony."  *Siji Yu v. Knighted LLC*, No. 15 Civ. 9340 (KMK), 2019 WL 2085990, at *8 (S.D.N.Y. May 13, 2019) (quoting *Mock v. Fed. Home Loan Mortg. Corp.*, No. 13 Civ. 1292 (LMB), 2014 WL 3545096, at *2 (E.D. Va. July 15, 2014), *aff'd*, 589 F. App'x 127 (4th Cir. 2014)), *aff'd*, 811 F. App'x 55 (2d Cir. 2020).  Schwartz cannot simply deny or ignore his own testimony in an effort to avoid summary judgment.

And Schwartz's other work reflected significant latitude for judgment on matters vital to both short- and long-term business objectives.  For instance, Schwartz was involved in helping the BIB Project run by ensuring that subcontractors were properly assigned to the appropriate projects.  Schwartz repeatedly downplays his role here as well, arguing that he did not "manage" any subcontractors or work-order vetting.  *See, e.g.*, Pl. Counter 56.1 Stmt. ¶¶ 35-36; Schwartz Declaration ¶ 2.  But Schwartz testified during his deposition that he and a couple other people did "most" of the work-order vetting, Schwartz Dep. Tr. at 37:2-23, which involved working with approximately one hundred subcontractors to "[h]elp[] clarify project parameters" and "check[] to make sure that they had filed the proper paperwork," *id.* at 35:1-18, as well as resolving issues that arose during that vetting, *id.* at 37:24-38:11.  He initially did this with two of the design project managers, *id.* at 37:2-9, before doing it with Fabian Perez and then Victoria Kravits, *id.* at 37:10-14.  Schwartz testified that he and Perez "work[ed] basically hand-in-hand," *id.* at 49:24-50:2, and

17

that Kravits was "like an assistant to [him]," *id.* at 50:3-6.  Thus the record reflects Schwartz's

substantial role in the work-order vetting process.

The other testimony in the record confirms this.  Flaherty testified that Schwartz was vital

to ensuring that the information was accurate so that houses could be assigned to construction

management organizations at the right time.  Flaherty Dep. Tr. at 13:5-14:4, 15:13-16:6.  And

Kenny, a project executive at DDC whose testimony Schwartz submitted in opposition to the City's

motion, emphasized that Schwartz was "involved from day one" in tracking each individual project,

and if a project "wasn't moving, [Schwartz] would be raising the red flag to figure out what was

going on to put pressure on the contractors."  Kenny Dep. Tr. at 21:24-22:8.  In other words,

Schwartz identified issues that needed remedying and worked to resolve some of these issues—

Schwartz and Kenny "would be pushing the contractors to start getting up there and getting out

there . . . to show the people in the communities that we were actually going to do something."  *Id.*

at 24:7-13.  In doing this, Schwartz worked with various sectors of the City government, including

DDC's regional offices, and construction management firms.  *Id.* at 25:8-19, 27:2-10.  This all

reflects Schwartz's ability to exercise independent judgment as to important issues.  *See, e.g.*,

*Grupke v. GFK Custom Rsch. N. Am.*, No. 13 Civ. 913 (PAC), 2015 WL 363589, at *7 (S.D.N.Y.

Jan. 28, 2015) (finding that an employee met the administrative exemption in part because she

"carried out major assignments in conducting the operations of the business," including

"coordinat[ing] studies, identif[ying] opportunities for improvements, and implement[ing] changes

that increased efficiencies").

Schwartz was also involved in making cost projections.  He would "project how much

money it would cost to do all of the projects based off of" individual estimations his team received

as to the cost of the average project.  Schwartz Dep. Tr. at 55:15-21.[10]  Schwartz testified that he would "adjust the budgeting" based on the projects his team was assigned.  *Id.* at 56:3-6.  While the record does not reflect that Schwartz had decision-making authority over where the funds should be spent, it does reflect Schwartz's involvement in a "major assignment" that was important to the long-term growth of the business.  *See Krumholz v. Village of Northport*, 873 F. Supp. 2d 481, 489 (E.D.N.Y. 2012) (finding a town treasurer to be exempt under the administrative exemption based, in part, on her role in drafting a budget, a "major assignment" that demonstrates authority to implement management policies or operating practices and indicates involvement in long- and short-term business objectives).

In addition, Schwartz counseled high-level City officials on matters important to both the daily operations and the long-term health of the project, and worked to develop data solutions to address management's needs.  Schwartz testified that he was unofficially "the lead project analyst." Schwartz Dep. Tr. at 47:25-48:1.  In this unofficial role he "frequently" wrote short statements and drafted PowerPoint presentations for the Assistant Commissioner, *id.* at 39:19-40:1, and "directly advise[d]" the Assistant Commissioner "[a]lmost daily," *id.* at 56:15-17.  He also met with other City officials, as he was "frequently called upon to sit and meet with the [A]ssociate [C]ommissioner, the [C]ommissioner himself, [and] the head of the Housing Recovery Office[,]" and "attended meetings at City Hall several times with the [D]eputy [M]ayor."  *Id.* at 48:4-7.

Flaherty attested to the importance of Schwartz's work and counsel.  Flaherty testified that Schwartz "helped develop a number of various analyses tools . . . to further understand what some of the key risks and challenges were on a program that's incredibly dynamic and complex."

___

[10] Schwartz states that "[h]e did not testify that he would create cost projections."  Pl. Counter 56.1 ¶ 52.  But his relevant testimony, which is repeated here, states that he would "project . . . cost[s]."  Schwartz Dep. Tr. at 55:19-21.

Flaherty Dep. Tr. at 14:4-14.  She also testified that Schwartz "developed very good tools to help us look at what was the average time frames for [the completion of construction of] various houses being managed by" different construction management firms.  *Id.* at 22:3-7.  This is not simply tabulating or entering data—it is exercising discretion to resolve management's problems.  As Flaherty emphasized, Schwartz "was a very critical member of the project controls team," as he "help[ed] us gather information and synthesize the information into reporting that could be understood by many," and "helped us, from a management perspective, use those tools to further manage the program and try to continue to push for progress."  *Id.* at 13:5-12.

The Court thus concludes that, as a matter of law, Schwartz's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3).  Because the two other factors are uncontested and clearly satisfied, *i.e.*, that (1) Schwartz earned a salary of at least $455 per week and (2) his "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," the Court finds that Schwartz is exempt from the FLSA under the "administrative exemption."  Because it rules on this ground, the Court does not address the City's remaining arguments in favor of summary judgment.

## IV.  Conclusion

For the foregoing reasons, the Court grants the City's motion for summary judgment.  The Clerk of the Court is respectfully directed to terminate all motions and close this case.

SO ORDERED.

Dated: September 24, 2021
     New York, New York
                                  JOHN P. CRONAN
                        United States District Judge